# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| ASBESTOS WORKERS LOCAL 42 PENSION FUND, derivatively on behalf of Nominal Defendant JPMORGAN CHASE & CO., a Delaware corporation,<br><br>    Plaintiff,<br><br>v.<br><br>LINDA B. BAMMANN, JAMES A. BELL, CRANDALL C. BOWLES, STEPHEN B. BURKE, DAVID M. COTE, JAMES S. CROWN, JAMIE DIMON, TIMOTHY P. FLYNN, ELLEN V. FUTTER, LABAN P. JACKSON, MICHAEL A. NEAL, DAVID C. NOVAK, LEE R. RAYMOND, WILLIAM WELDON, DOUGLAS L. BRAUNSTEIN, MICHAEL CAVANAGH, INA DREW, IRVIN GOLDMAN, JOHN HOGAN, PETER WEILAND, JOHN WILMOT, and BARRY ZUBROW,<br><br>    Defendants,<br><br>and<br><br>JPMORGAN CHASE & CO.,<br><br>    Nominal Defendant. | C.A. No. 9772-VCG |

## MEMORANDUM OPINION

Date Submitted: February 3, 2015
Date Decided: May 21, 2015
As Revised: May 22, 2015

Carmella P. Keener and P. Bradford deLeeuw, of ROSENTHAL, MONHAIT & GODDESS, P.A., Wilmington, Delaware; OF COUNSEL: Stewart L. Cohen, Robert L. Pratter, Jacob A. Goldberg, and Alessandra C. Phillips, of COHEN, PLACITELLA & ROTH, P.C., Philadelphia, Pennsylvania; Peter Safirstein and Elizabeth Metcalf, of MORGAN & MORGAN, P.C., New York, New York, *Attorneys for Plaintiff.*

Gregory P. Williams, Catherine G. Dearlove, and Christopher H. Lyons, of RICHARDS LAYTON & FINGER P.A., Wilmington, Delaware; OF COUNSEL: Richard C. Pepperman, II and George R. Painter IV, of SULLIVAN & CROMWELL LLP, New York, New York; Daryl A. Libow and Christopher M. Viapiano, of SULLIVAN & CROMWELL LLP, Washington, D.C., *Attorneys for Defendants James Dimon, Douglas L. Braunstein, Michael Cavanagh, Ina Drew, Irvin Goldman, John Hogan, Peter Weiland, John Wilmot, Barry Zubrow and JPMorgan Chase & Co.*

David C. McBride, William D. Johnston, and Kathaleen S. McCormick, of YOUNG CONAWAY STARGATT & TAYLOR LLP, Wilmington, Delaware; OF COUNSEL: Jonathan C. Dickey and Brian M. Lutz, of GIBSON DUNN & CRUTCHER LLP, New York, New York, *Attorneys for Defendants Linda B. Bammann, James A. Bell, Crandall C. Bowles, Stephen B. Burke, David M. Cote, James S. Crown, Ellen V. Futter, Timothy P. Flynn, Laban P. Jackson, Jr., Michael A. Neal, David C. Novak, Lee R. Raymond, and William C. Weldon.*

**GLASSCOCK, Vice Chancellor**

The C.W. Morgan is the last surviving ship of the American whaling fleet.[1] In 1820, another ship of that fleet, the Essex, was attacked by a sperm whale, which rammed the ship repeatedly until the planking was sprung and timbers broken. The Essex foundered, utterly destroyed.[2] In 2012, another Morgan— JPMorgan Chase & Co. ("JPMorgan," or the "Company")—was heavily damaged by another whale—the so-called London whale. JPMorgan did not founder, but suffered losses in the billions of dollars.

The Plaintiff here is a stockholder of JPMorgan, seeking derivatively to hold those at the helm accountable for the damage caused by the London whale. It seeks to sue the directors (and certain officers) of JPMorgan under a theory based on the rationale of this Court's decision *In re Caremark International Inc. Derivative Litigation.*

Under our model of corporate law, the directors run the corporation as fiduciaries for its owners, the stockholders. Assets of the corporation, including choses in action, are disposed of within the discretion of the board.[3] A stockholder who believes that the corporation should pursue legal proceedings, therefore, must request that the board take that action on behalf of the corporation. Only in

---

[1] *See Charles W. Morgan*, Mystic Seaport, http://www.mysticseaport.org/visit/explore/morgan/ (last visited May 20, 2015).
[2] *See* Owen Chase, Narrative of the Most Extraordinary and Distressing Shipwreck of the Whale-Ship Essex (1821).
[3] The reader is referred to the interesting historical discussion of derivative actions in *In re Activision Blizzard, Inc. S'holder Litig.*, C.A. No. 8885-VCL, at 29–36 (Del. Ch. May 20, 2015).

1

circumstances where the board is not in a position to exercise its independent business judgment with respect to the litigation is demand excused and the stockholder permitted to sue derivatively on behalf of the corporation. The requirements for demonstrating that demand is excused are provided by Chancery Court Rule 23.1. The Plaintiff contends that it has satisfied this rule.

This identical issue—whether the Board is unable to exercise its independent business judgment with respect to a lawsuit against certain directors and officers arising out of the losses caused by the London whale trading episode, has been heard, and rejected, by two New York Courts.[4] The Plaintiff here is collaterally stopped from relitigating the issue, and the Defendants' Motion to Dismiss is granted on that ground.

## I. BACKGROUND FACTS[5]

The basic factual background to this action has been widely publicized. The Synthetic Credit Portfolio ("SCP"), a portfolio managed by traders in the Chief Investment Office ("CIO") of JPMorgan Chase & Co. ("JPMorgan" or the "Company") lost approximately $6.3 billion in 2012 as a result of complex, high-

---

[4] *See In re JPMorgan Chase & Co. Derivative Litig.*, 2014 WL 1297824 (S.D.N.Y. Mar. 31, 2014), *reconsideration denied*, 2014 WL 3778181 (S.D.N.Y. July 30, 2014); *Wandel v. Dimon*, No. 651830/12 (N.Y. Sup. Ct. Feb. 3, 2014) (Dkt. No. 79). In *Siegel v. Bell*, Index No. 652151/12 (N.Y. Sup. Ct.), the court also considered allegations related to the Synthetic Credit Portfolio losses, but the Defendants posit that I need not consider its preclusive effect given the judgments in *In re JPMorgan* and *Wandel*.

[5] Unless otherwise indicated, all facts are taken from the Plaintiff's Verified Derivative Complaint.

2

risk trading, and despite the public representations that the CIO was engaging in hedging activity.[6] Even before the losses became apparent, the head trader of the SCP, Bruno Iksil, was nicknamed the "London whale" for the large credit default swap trades he was making on behalf of the Company.[7]

Concern about the whale's trading activity was at one point infamously characterized by the Company's CEO as a "tempest in a teapot." Eventually, however, the full extent of the Company's losses was revealed. The loss and the belatedly-recognized events leading to it were covered extensively in the press; examined by the United States Senate Permanent Subcommittee on Investigations; studied by academics; and were the subject of a number of agency investigations and stockholder lawsuits.

In connection with the trading losses and aftermath, the Plaintiff alleges, on the part of the Board, "a sustained and systemic failure to institute and maintain proper control or oversight of the Company's accounting and financial reporting practices as related to the operation of the CIO" and that the Board "improperly

---

[6] The trading activity that occurred is highly technical. I do not attempt to explain the strategies in more detail than is necessary to the pending Motion to Dismiss. The interested reader is directed to the report of the United States Senate Permanent Subcommittee on Investigations, *JPMorgan Chase Whale Trades: A Case History of Derivates Risks and Abuses*, Mar. 15, 2013, *available at* http://www.hsgac.senate.gov/subcommittees/investigations/hearings/chase-whale-trades-a-case-history-of-derivatives-risks-and-abuses, for its factual background.

[7] *See e.g.*, Gregory Zuckerman & Katy Burne, *"London Whale" Rattles Debt Market*, Wall St. J., Apr. 6, 2012, *available at* http://online.wsj.com/article/SB10001424052702303299604577326031119412436.html (cited in Compl. ¶ 289).

transformed or permitted the transformation of its function from hedging the bank's investment risk to highly leveraged speculative trading."[8] The Plaintiff seeks to pursue its derivative claim without having made demand on the Board, alleging that demand would be futile because the majority of the Board is interested or not independent. The Plaintiff alleges that a majority of the Board could not impartially consider demand because they face a substantial likelihood of personal liability in connection with alleged breaches of the duty of loyalty for failure in their oversight function, as well as for material misstatements or omissions in SEC filings between 2009 and 2011.[9] The Plaintiff also alleges a lack of independence due to the compensation and benefits connected with the directors' service on the Board.[10]

*A. The Parties*

The Plaintiff has continuously held stock in the Company at all relevant times. The Defendants in this action include current and former members of the Board, and current and former officers, discussed below.

### 1. Director Defendants

Seven of the named defendants who are currently on the Board joined the Board prior to January 1, 2009: Crandall C. Bowles, Stephen B. Burke, James S.

---

[8] Compl. ¶ 2.
[9] *See id.* ¶¶ 350–51.
[10] *See id.* ¶¶ 367–71.

4

Crown, Jamie Dimon, Laban P. Jackson, Jr., Lee R. Raymond, and William C. Weldon (the "2009 Director Defendants"). James A. Bell joined the Board prior to May 10, 2012, when the CIO losses were revealed (together with the 2009 Director Defendants, the "CIO Director Defendants").

Three of the named defendants were members of the Board at the time of the complained-of actions, but are no longer on the Board: David M. Cote, Ellen V. Futter and David C. Novak (together, the "Former Director Defendants"). Additionally, three of the named defendants joined the Board after the events leading to the CIO losses occurred: Linda B. Bammann, who joined the Board in September 2013, Timothy P. Flynn, who joined the Board in May of 2012, and Michael A. Neal, who joined the Board in January 2014 (together with the CIO Director Defendants and the Former Director Defendants, the "Director Defendants").

### 2. Officer Defendants

Douglas L. Braunstein was the Company's Executive Vice President and CFO from June 22, 2010 to January 1, 2013, at which time he became Vice Chairman.

Michael J. Cavanagh served as the Company's Executive Vice President and CFO from 2004 until May 2010, at which time he became CEO of the Company's Treasury and Securities Services Business until May 2012, at which time he

5

became Co-CEO of the Company's Corporate & Investment Bank, which position he currently holds. He was on the Company's Operating Committee at all relevant times.

Ina Drew was the Company's Chief Investment Officer from February 2005 until May 13, 2012. She was also a member of the Operating Committee at all relevant times.

Irvin Goldman was the CIO's Chief Risk Officer ("CRO") from January 2012 through May 2012, at which time, Plaintiff alleges, he was stripped of his duties prior to his resignation in July 2012. He previously served as the CIO's Head of Strategy.

John Hogan was the Company's CRO from January 2012 through early 2013. Upon returning from a brief leave of absence, he was named Chairman of Risk. He is also a member of the Company's Operating Committee, and has been since January 2012.

Peter Weiland was the CIO's Head of Market Risk, its most senior risk officer, from late 2008 through early 2012. He reported to Barry Zubrow and to Drew from 2009 until mid-January 2012. He announced his retirement in October 2012.

John Wilmot was the CFO of the CIO beginning in January 2011 and "resigned in connection with the CIO scandal."[11]

Barry Zubrow was the Company's head of Corporate and Regulatory Affairs from January 2012 to February 2013. He previously served as the CRO from November 2007 to January 2012. He also served on the Company's Operating Committee from 2010 until October 2012, when he announced his retirement effective February 2013.

Zubrow, Wilmot, Weiland, Hogan, Goldman, Drew, Cavanagh, and Braunstein are referred to as the "Officer Defendants."

### 3. Risk Management and Relevant Committees

The Board's Audit Committee is charged with overseeing the Company's risk assessment and management process.[12] Of the Director Defendants, Bell, Bowles, and Jackson serve on the Audit Committee. The Risk Policy Committee "oversees the CEO and management's responsibilities to assess and manage JPMorgan's various types of risk," including credit, market, interest rate, investment, liquidity, and reputational risks.[13] Crown is the Chairman of the Risk Policy Committee, and from 2008 to May 2012, former-directors Cote and Futter

---

[11] *See id.* ¶ 44.
[12] *See id.* ¶ 62.
[13] *Id.* ¶ 76.

7

were members of the Committee. Flynn joined the Risk Policy Committee in August 2012.[14]

The Company maintains a firm-wide operation run by the Company's CRO, independent of the Company's individual lines of business, referred to as "Risk Management."[15]

*B. Overview*

The Plaintiff alleges breaches of the duty of loyalty, by way of a lack of good faith, in "remain[ing] willfully blind" "in the face of [] red flags" which showed the CIO to be engaging in higher-risk activity than represented.[16] The essence of the derivative action is that, despite the risky trading undertaken by the CIO, "the Board failed to ensure the implementation of a risk management structure commensurate" with that risk.[17]

Prior to filing the Complaint, the Plaintiff undertook a § 220 demand (the "§ 220 Demand") and obtained and reviewed documents dating back to 2009 from which it alleges what the Board and relevant committees knew, and when. The Plaintiff asks me to draw negative inferences from what was not produced.[18] What follows is an overview of the facts alleged in the Complaint; I do not aim to

---

[14] *See id.* ¶ 82.
[15] *See id.* ¶ 119.
[16] Pl.'s Br. in Opp'n to Defs.' Mot. to Dismiss the Verified Derivative Compl. for Failure to Adequately Allege Demand Futility at 4; *see also* Compl. ¶ 9.
[17] Pl.'s Br. in Opp'n to Defs.' Mot. to Dismiss the Verified Derivative Compl. for Failure to Adequately Allege Demand Futility at 5.
[18] *See* Compl. ¶¶ 88–113.

describe the Complaint and the documents it incorporates by reference in their entirety.[19]

### C. *The CIO*

JPMorgan's CIO, "formed in 2005 through a spin-off of the Company's internal treasury function, is part of the Corporate and Private Equity sector at JPMorgan and manages the Company's excess cash deposits."[20] It was touted in the Company's annual reports, the Plaintiff notes, "as mitigating structural risks that arise out of the various business activities" of the Company.[21] The Plaintiff alleges that the CIO "[t]raditionally . . . followed a typical conservative approach for large banks and invested the Company's excess deposits in very safe instruments, including U.S. treasury bonds, municipal bonds, corporate securities, high-grade corporate bonds, and high-grade mortgage-backed securities."[22] Because the CIO was supposedly engaging in hedging, that is, "an investment position that is specifically made, documented and designed to reduce or offset the risk from a specific investment," it was subject to regulations of the Office of the

---

[19] The Complaint contains 386 paragraphs in 212 pages. I note that in *Grimes v. Donald*, 673 A.2d 1207, 1215 (Del. 1996), then-Chief Justice Veasey referred to a 43-page complaint as "prolix." By the time of *Brehm v. Eisner*, 746 A.2d 244, 249 (Del. 2000), it was an 88-page, 285-paragraph complaint that the Court considered "prolix." Where are the snows of yesteryear? I note, however, that if this is a trend, it is, unfortunately, not limited to *practitioners* before the Court of Chancery. *See Ironworkers Dist. Council of Philadelphia & Vicinity Ret. & Pension Plan v. Andreotti*, 2015 WL 2270673, at *2 n.2 (Del. Ch. May 8, 2015).

[20] Compl. ¶ 140.

[21] *Id.*

[22] *Id.* ¶ 141.

9

Comptroller of the Currency ("OCC"), which require, in essence, defined strategies that describe the investment instruments and acceptable levels of risk.[23]

In 2005, Dimon appointed Drew to serve as the Company's Chief Investment Officer "as part of his plan to transform the CIO from a risk-mitigating operation to a profit center," by which they, together with other senior executives, "aggressively transformed the CIO into a proprietary trading desk."[24] In May 2006, the CIO authorized trading in credit derivative indices and credit default swaps not limited to a single corporation. This "New Business Initiative" "was presented as a risk reduction effort to protect JPMorgan against cyclical exposure to credit," and was assigned an initial Value-at-Risk ("VaR") of $5 million.[25] This credit-trading program came to be known as the Synthetic Credit Portfolio. The Plaintiff notes that trading in the CIO was more profitable than in other divisions because the CIO's cost of investment capital was lower than that of the investment bank division (the "Investment Bank") by virtue of using excess bank deposits and because CIO traders retained a smaller portion of the trading profits than Investment Bank traders.[26]

---

[23] *Id.* ¶¶ 5–6.

[24] *Id.* ¶ 142. Proprietary trading, the Plaintiff notes, involves the Company "trading to generate profits using its own account and taking on greater risk in the process. This is distinct from a business unit that manages risk through hedge trades, which is what JPMorgan and the Board represented CIO's purpose was to its stockholders." *Id.*

[25] *Id.* ¶ 144. Value-at-Risk is a measure of a risk of loss.

[26] *See id.* ¶ 156.

Beginning in November 2007, "internal audits recognized there were problems with the CIO's methods of accounting and price testing of credit derivatives."[27] In conducting an audit that was characterized as a "First Time Review of New Business, Product or Service," the Company's internal auditors described the CIO's activities as "proprietary position strategies executed on credit and asset backed indices"[28] and did not indicate that the credit trading activity was being conducted to lower the Company's risk.[29] The internal audit group found the CIO's control environment satisfactory but noted "calculation errors" in the CIO Valuation Control Group's testing of prices of credit derivatives.[30]

The Plaintiff alleges, "After changing the focus of the SCP from asset-liability management to generating revenue, JPMorgan failed to document this change in the SCP in accordance with its own internal policies and failed to disclose the portfolio's existence to regulators."[31] In 2008, for example, Dimon, Drew, and "certain of the [other] Defendants" "violated OCC notification requirements by failing to inform the OCC that the SCP had added credit index tranche positions to the SCP even though this addition represented a 'substantial change in business strategy.'"[32] Specifically, the SCP was not mentioned in

---

[27] *Id.* ¶ 146.
[28] *Id.*
[29] *Id.* ¶ 147.
[30] *Id.*
[31] *Id.* ¶ 150.
[32] *Id.* ¶ 151.

11

written communication to regulators until January 2012, five years after its inception, and "the first time the OCC became aware of the SCP's true size and risk exposure was after the portfolio attracted media attention in April 2012."[33]

*D. Relevant Board and Committee Activity in 2009–2010*

The Plaintiff alleges that "[b]eginning in 2009, the Board repeatedly knew of red flags and warnings regarding the substantially risky nature of the CIO's business, and the dramatically rising size and profitability of the CIO's business."[34] Specifically, for example, the Audit Committee met on March 17, 2009, at which time Drew gave a presentation (the "March 2009 Audit Presentation") which included notification that the "[i]ncrease in size, complexity and range of product investments, as well as severe market conditions, have led to increased demands on CIO's risk management and control environment;" the portfolio had grown by $132 billion since the last time the Audit Committee reviewed it.[35] In the March 2009 Audit Presentation, the Audit Committee was informed that "the operating model is clearly more complicated and more prone to error than in the past," and that "FASB and other accounting rules continue to be more restrictive with enhanced documentation required and stricter interpretation of rules by

---

[33] *Id.* ¶ 152. As the Plaintiff notes, "The OCC later determined in 2012 that the Company had failed to notify the OCC that the SCP had added credit derivatives that were moved from what was then called the 'Proprietary Positions Book' in the Investment Bank when that trading book closed down." *Id.* ¶ 153.
[34] *Id.* ¶ 161.
[35] *Id.* ¶ 163.

auditors/regulators."[36] Further, the March 2009 Audit Presentation showed that the CIO would be integrating a portion of the Investment Bank's "Proprietary Positions Book" ("PPB") technology platform into its existing infrastructure. The PPB technology "had the ability to handle complex derivative trades to address the fact that [the CIO's] prior infrastructure could not handle the new activities the CIO was engaging in."[37] The need for the new technology, the Plaintiff asserts, "demonstrates that the Audit Committee was aware of the metamorphosis of the CIO from a conservative risk-averse protector of capital, into an aggressive proprietary trading unit, despite its outward [appearance] as a conservative risk-averse business unit."[38]

The Plaintiff alleges the Audit Committee made a presentation to the rest of the Board that same day. The minutes of both the Audit Committee meeting and the Board meeting "fail to reflect any additional actions taken by the Director Defendants or any discussion into the sources of this complexity and whether the risk control framework that was in place was adequate to support the increased demands the trading activities put upon the CIO."[39] Also in March 2009,

> [t]he revelation that the CIO earned over 86% more in 2009 than it had budgeted for constituted additional red flags to the Audit Committee and the Board to ensure that the risk management and

---

[36] *Id.* ¶ 166.
[37] *Id.* ¶ 169.
[38] *Id.*
[39] *Id.* ¶165.

procedures designed and implemented for the CIO were still consistent with that business unit's corporate strategy, in the face of massive profits from within a conservative and risk-averse business unit.[40]

In the absence of documents in response to the Plaintiff's § 220 Demand for the months of April through August 2009, the Plaintiff infers that neither the Board nor its committees addressed the CIO's practices or oversight thereof.[41]

On September 15, 2009, the Board met and was given a report by the Risk Policy Committee, as well as a presentation by Drew in which she discussed the CIO's role in managing interest rate risk[42] and mortgage exposure.[43] The Plaintiff infers, again in the absence of documents produced in response to its § 220 Demand, that neither the Board nor its committees looked into the CIO's activities, including the management and oversight thereof, between May and December 2009, as well as January through June 2010.

The Plaintiff also alleges that "[b]y the end of 2009, SCP revenues had increased fivefold over the prior year, producing over $1 billion in revenue," a

---

[40] *Id.* ¶ 174.

[41] *See id.* ¶ 173.

[42] *See* Aff. of Christopher M. Viapiano Ex. L at JPMC-CIODEMAND-3366 ("Ms. Drew discussed Interest Rate Exposure. . . . Ms. Drew described the key measures for the current interest rate position, discussed risks to the current position and discussed factors under consideration with respect to exiting our positions in anticipation of increasing interest rates, a matter which must be executed over time and for which specific steps are being planned."), *cited in* Compl. ¶ 176.

[43] *See* Aff. of Christopher M. Viapiano Ex. L at JPMC-CIODEMAND-3369 (noting, under the heading "Report of Risk Policy Committee," that "Ms. Drew reported on the interest rate risk management process, which was also discussed with the full Board, and also discussed mortgage exposure under the management of the Chief Investment Office."), *cited in* Compl. ¶ 176.

14

"stark increase over the $170 million in revenue for the SCP in 2008."[44]   The

Plaintiff contends that "inflated revenues of over $1 billion are a red flag, and

incongruous with a conservative hedge strategy," in light of the Company's overall

performance.[45]

In July 2010, the Audit Committee met over two days.  The meeting minutes

reflect:

> Ms. Drew and Messrs. Bonocore and Weiland joined the meeting and
> provided an update on the Chief Investment Office (CIO) operating
> risk and control environment. Over the past three years, the business
> platform has significantly increased in size, complexity and range of
> product investments. This has led to increased demands on risk
> management, controls, technology and infrastructure. Management
> stated that the controls have kept pace with the increased complexity
> of the business. Other topics discussed included the integration of the
> Treasury support functions into the existing CIO platform, progress on
> the multi-year technology project and enhancements to the valuation
> process. Following the discussion, Ms. Drew and Messrs. Bonocore
> and Weiland left the meeting.[46]

The materials presented to the Audit Committee also showed that the CIO's actual

pre-tax revenues were $2.345 billion for 2008 and $9.312 billion for 2009, along

with a CIO pre-tax forecast of $6.5 billion for 2010.  Because no documents were

produced (1) "evidencing that the Audit Committee made any inquiries into how

the CIO's controls were keeping pace 'with the increased complexity of the

business,'" nor (2) showing "that, in 2009 and/or 2010, the Audit Committee

---

[44] Compl. ¶ 175.
[45] Id.
[46] Id. ¶ 182.

15

limited or constrained speculative trading in the SCP, nor that it properly disclosed such trading or requested any proof of compliance with accounting, regulatory and documentation requirements relating to SCP trading in the CIO," or (3) indicating "how the CIO was testing its controls or if the Audit Committee made any assessment of how the CIO's business fit within JPMorgan's risk appetite as a whole," the Plaintiff requests a negative inference "that the Audit Committee, along with the other 2009 Director Defendants, turned a blind eye to such wrongful practices for years prior to the losses and damages complained of herein" and failed to ensure proper risk management and oversight procedures in the face of the CIO's strategy.[47]

In September and December 2010 presentations to the Risk Policy Committee, the SCP was shown as having "one of the shortest investment horizons in the CIO and display[ing] short-term speculative tactics," which "activities were clearly not conservative and were not a legitimate hedge as defined by accounting and regulatory authorities."[48] The presentations also showed "[s]ubstantial increases in profits" which, the Plaintiff contends, "constitute a red flag where, as here, the CIO was being publicly portrayed as a risk management tool, not a profit-making trading operation."[49]

---

[47] *Id.* ¶ 183.
[48] *Id.* ¶ 189.
[49] *Id.* ¶ 190.

The September 2010 presentation to the Risk Policy Committee indicated that the CIO's "key mandate" was to "[o]ptimize and protect the Firm's balance sheet from potential losses, and create and preserve economic value over the longer-term."[50] In the absence of documents produced, the Plaintiff requests "a negative inference that the [Risk Policy Committee] asked no questions and took no risk oversight role with regards to the information" in that presentation.[51]

The Risk Policy Committee met on December 14, 2010, at which meeting it was "responsible for approving the firm-wide Risk Appetite Policy on behalf of the Board of Directors."[52] In a presentation from the CIO, the Risk Policy Committee was informed that "[t]actical credit strategies have contributed approximately $2.8bn in economic value from inception with an average annualized [return on equity] of 100%."[53] This, the Plaintiff alleges, should have alerted the committee that the CIO was not mitigating risk, but rather, was working as a profit center. The Risk Policy Committee reported to the Board and included a summary of its agenda related to the aforementioned December meeting.

---

[50] *Id.* ¶ 192 (emphasis omitted).

[51] *Id.* ¶ 193.

[52] *Id.* ¶ 195. A "Risk Appetite" presentation indicated, among other things, "several risk factors for which the Firm has little to no tolerance level," including "[a]ctions that damage the Firm's [r]eputation;" "[l]ack of compliance with regulatory mandates;" "[e]ntering into products and services that are not well understood, are excessively complex, or are misleading to customers;" and "[w]eak control environment." *Id.* ¶ 196.

[53] *Id.* ¶ 198.

17

Also in December 2010, the OCC sent a letter to Drew including a "Matters Requiring Attention" ("MRA") report that found that "management needed to 'document investment policies and portfolio decisions,'" and that "the 'risk management framework' for the investment portfolios, including the SCP, lacked a 'documented methodology,' 'clear records of decisions,' and other features to ensure that the CIO had appropriate controls in place and was exercising appropriate risk management measures."[54] From this, the Plaintiff posits that "the Complaint draws the reasonable inference that the Board failed 'to ensure that a risk management and control environment structure commensurate to the CIO's new proprietary trading strategy existed.'"[55] It is not clear whether the MRA was presented to the Board, the Audit Committee, or the Risk Policy Committee.[56]

*E. Relevant Board and Committee Activity in 2011–2012*

As discussed below, one of the bases for the present Motion to Dismiss is that the application of collateral estoppel precludes relitigation of the issue of demand futility. In response, also discussed below, the Plaintiff pointed to its supplemental document production, which allowed it to allege facts dating back to 2009 and 2010, as making the Complaint (in the Plaintiff's view) materially different and thus precluding application of collateral estoppel. In the interest of

---

[54] *Id.* ¶ 200.
[55] Pl.'s Br. in Opp'n to Defs.' Mot. to Dismiss the Verified Derivative Compl. for Failure to Adequately Allege Demand Futility at 8 (quoting Compl. ¶ 12).
[56] *See* Compl. ¶ 204.

efficiency, my summary of the facts alleged outside that time period is somewhat abbreviated here.

Throughout the spring of 2011, the Risk Policy Committee and Audit Committee met at various times. Reports showed that the CIO's Value-at-Risk had increased by $11 million in the first quarter of 2011, that the firm-wide "Aggregate Stress" had exceeded its $8.8 billion limit by $400 million, "driven by increased stress losses from position changes within the [Investment Bank] and CIO,"[57] and that the CIO and Risk Management had, as the Plaintiff terms it, "high-severity audit issues."[58] In a May 2011 Board meeting, the Board was informed that the Corporate Department, which includes the CIO and Treasury, had "[h]igher expenses and lower [price-to-earnings ratio], partially offset by higher trading gains," which the Plaintiff alleges was another red flag since "[t]he CIO was designed to offset risk, not make a profit, for the Company."[59]

A July 2011 Audit Committee meeting showed that while firm-wide VaR had decreased, the CIO's VaR "remained materially unchanged" from January to February 2011, and that, in February, the firm-wide Aggregate Stress was only $100 million below its $8.8 billion limit.[60] In a different July 2011 meeting, Risk Management provided the Risk Policy Committee with more specific information

---

[57] Id. ¶ 209.
[58] Id. ¶ 210.
[59] Id. ¶ 211.
[60] Id. ¶ 212.

about the VaR and stress limits through June of 2011, rather than stopping at February as the Audit Committee's data did. In the Board meeting that month, Jackson provided "an update on the Chief Investment Office operating risk and control environment, stating that overall control environment and business processes remain strong."[61]

In September, the Risk Policy Committee was informed that firm-wide VaR exceeded its $125 million limit seven days in the month of August, driven primarily by market volatility. They were also informed that the CIO had breached its aggregate stress limit of $800 million by $90 million, "driven mainly by decreasing positive impact of the synthetic credit tranche book."[62] Similar notifications that firm-wide VaR had exceeded its limits were present in reports provided to the Risk Policy Committee in October and December 2011.

The Audit Committee met in November and the minutes from that meeting are the first to reflect any discussion of credit default swaps; though no details of the discussion are provided in the minutes, the Plaintiff notes the significance of *any* mention of credit default swaps, as these are the "risky type of trades engaged in by the CIO which resulted in its subject losses."[63]

---

[61] *Id.* ¶ 214.
[62] *Id.* ¶ 215.
[63] *Id.* ¶ 218.

20

A report provided to the Risk Policy Committee in December 2011 indicated that the firm had "temporarily increased" its VaR limit to $185 million and indicated in a footnote that the firm modified its stress limits as well.[64]

The size of the SCP increased tenfold in 2011 alone due to excess deposits that poured into JPMorgan in the wake of the financial crisis; because it was perceived as a sound financial institution, "JPMorgan's deposits grew by $380 billion, or more than half, in four years."[65] Given such a dramatic increase in the size of the portfolio, the Plaintiff opines that "it was imperative that the CIO adhere to the strong risk management practices that JPMorgan management and the Board publicly represented the Company followed" and it was "imperative that the Board closely monitor and mitigate the Company's risk exposure due to all of the CIO's activities. Subsequent events reflect that this never took place, to the detriment of the Company and its shareholders."[66]

In January 2012, PricewaterhouseCoopers sent the Audit Committee its 2012 audit plan, which referenced the Volcker Rule of the Dodd Frank Act. The originally proposed Volcker Rule would have banned all proprietary trading—that is, using deposits to trade on a bank's own account—by commercial banks without

---

[64] *Id.* ¶¶ 220–21.
[65] *Id.* ¶ 157.
[66] *Id.* ¶ 158.

the express consent of depositors; this would have rendered the described CIO trading practices unlawful, according to the Plaintiff.[67]

The Risk Policy Committee also met in January and was informed that firm-wide average VaR had increased over the previous quarter, which increase was "driven by increased VaR in [the Investment Bank], CIO and [Retail Financial Services]."[68] The Risk Policy Committee reported to the Board as well, indicating that the challenges for the CIO included "[r]egulatory uncertainty," "[i]nvestment challenges," and "Volcker."[69]

In a February report by PricewaterhouseCoopers to the Audit Committee, the auditor stated:

> In communicating our 2011 audit plan to the Audit Committee in January 2011, we shared our initial assessment of significant audit risks . . . [that] requir[e] special consideration because of the nature of necessary judgment (higher inherent risk), the likelihood of error occurring, and likely magnitude of potential misstatements:
>
> - Valuation of complex and/or illiquid financial instruments within the [REDACTED] Chief Investment Officer [sic] (CIO)/Treasury (TSY), including the methodologies and tools applied[.]
>
> [REDACTED]

---

[67] *Id.* ¶ 225. The Complaint notes that according to a report by the New York Times, JPMorgan made strong arguments that resulted in a less restrictive version of the Rule. *See id.* (citing Edward Wyatt, *JPMorgan Sought Loophole on Risky Trading*, N.Y. Times, May 12, 2012, *available at* http://www.nytimes.com/2012/05/12/business/jpmorgan-chase-fought-rule-on-risky-trading.html).
[68] *Id.* ¶ 231.
[69] *Id.* ¶ 230.

22

- Application of fair hedge accounting within CIO/TSY.[70]

That report also noted that the CIO was among "[s]ignificant accounting and financial reporting matters [that] were discussed with the Audit Committee during the [preceding] year."[71]

The Risk Policy Committee met again on March 20, 2012, at which time the deputy to the CRO reported on increased VaR limits in late 2011, including that of the CIO. The Risk Policy Committee also provided a report to the Board, in which it relayed "a VaR temporary one-off limit implemented in late 2011, in response to increased [Mortgage Servicing Rights] VaR;" that the Company's aggregate stress limit was raised from $8.8 billion to $9.75 billion in November 2011; that the Company's VaR was increased from $125 million to $150 million due to a reduction in diversification benefit; and that the CIO VaR was also temporarily raised.[72]

As discussed below, shortly after this meeting, Drew temporarily stopped CIO trading on March 23, 2012, and the media began reporting Iksil's trades in early April.

---

[70] *Id.* ¶ 234 (alterations in original).
[71] *Id.* ¶ 236.
[72] *Id.* ¶ 238.

*F. Goings-on in the CIO—"A Lot of Tempest in a Pot o' Tea!"*[73]

At all relevant times, the Company claimed that the SCP was a "macro-level hedge," which would not require a "reasonable correlation" with the assets being hedged.[74] But, the Plaintiff asserts, "all hedges must offset a specified risk associated with a specified position," and without such specificity, a hedge cannot be tested for effectiveness—it would instead "function as an investment designed to take advantage of a negative credit environment."[75] In the absence of documentation as to hedging methodologies, the Plaintiff points out, it seems that the SCP was not functioning as a hedge at all.[76] As the Plaintiff contends, "To date, no CIO documentation has surfaced to indicate that SCP's credit derivatives were subjected to JPMorgan's risk management objectives and strategy analysis."[77] The Plaintiff notes that the lack of documentation "stands in contrast to accepted JPMorgan procedure with respect to other CIO hedges."[78]

The Complaint notes that, in an attempt to lower risk-weighted assets in the CIO at the end of 2011, and thereby reduce the Company's capital requirements,

---

[73] "The whole thing don't sound very good to me." Richard Rogers & Oscar Hammerstein II, *All Er Nuthin'*, *on* Oklahoma! (Decca Records, 1943).

[74] *Id.* ¶ 248. The Plaintiff also notes that an internal presentation by the CIO intended to prepare JPMorgan executives for an earnings call in April 2012 showed that, for example, if there was a new financial crisis, the SCP would also lose money, indicating it was not functioning to offset macro-level losses. *See id.* ¶ 260.

[75] *Id.*

[76] *See id.* ¶ 249.

[77] *Id.* ¶ 254.

[78] *Id.* ¶ 257.

the CIO adopted a trading strategy that resulted in greater complexity in the fall of 2011.[79] The Plaintiff also alleges that the compensation for the CIO provided incentives that were no different from those in the Investment Bank—that is, the compensation "rewarded CIO traders for financial gain and risk-taking more than for effective risk management."[80]

The Plaintiff also alleges that the CIO lacked adequate risk personnel and that internal reporting lines disabled risk personnel from "stand[ing] up to the CIO leadership to challenge investment strategies within the CIO."[81] A new CRO of the CIO, Goldman, was appointed in January 2012 on advice of Drew and Zubrow; Goldman is Zubrow's brother-in-law and had worked for Drew previously, but not in a risk management capacity.[82] That same month, "when the CIO began to breach its own risk limits and those of the Company due to the SCP losses," neither Goldman nor Weiland, the Chief Market Risk Officer for the CIO, enforced the risk limits.[83]

---

[79] *See id.* ¶ 239. The Complaint also noted that in late 2011, Iksil placed a large bet that cost up to $1 billion and required at least two companies to declare bankruptcy or go into default by December 20, 2011. When the media and other traders became aware of his bet, hedge fund investors began betting against Iksil's positions. "Luckily, on November 29, 2011, American Airlines declared bankruptcy and triggered a massive payout to holders of the short side of the position—which included the CIO, to the tune of $400 million in gains to JPMorgan." *Id.* ¶ 241. But for this amount, the Plaintiff alleges, the SCP would have lost money in 2011. *See id.* ¶¶ 240–44.

[80] *Id.* ¶ 245. *See also id.* ¶¶ 246–47.

[81] *See id.* ¶ 262.

[82] *See id.* ¶ 263.

[83] *Id.* ¶ 264.

In January, the SCP sustained losses breaching multiple VaR risk limits for the CIO and for the Company as a whole, but rather than undertake remedial action, the Company "largely ignored the breaches or raised the relevant risk limit, which did not resolve the underlying issue."[84]

In late January, a new VaR risk model was introduced for the CIO, under which the SCP's risk level "immediately lowered . . . by 50%, which both ended the breach and enabled the CIO to continue to engage in derivatives trading without appropriate monitoring."[85] The SCP had sustained losses on 17 of 21 business days in January, which continued into February (losses on 15 of 21 business days) and March (losses on 16 of 22 business days).[86]

Also beginning in late January, CIO traders began to avoid using accepted methodology for marking similar positions and began mismarking their books to conceal losses.[87] Because the Investment Bank was a counterparty to some of the CIO's trades, and used a different marking methodology, the CIO's mismarking became apparent even to outside counterparties.[88]

According to the Senate Report, when the counterparties pushed back, the SCP traders engaged in trading designed to "defend" their valuation;[89] upon

---

[84] *Id.* ¶ 269; *see also id.* ¶ 264.
[85] *Id.* ¶ 271.
[86] *Id.* ¶ 272.
[87] *See id.* ¶ 280 (describing what the Plaintiff characterizes as mismarking).
[88] *See id.* ¶¶ 287–88.
[89] Senate Report at 86.

learning of this defensive approach, on March 23, 2012, Drew ordered CIO traders to stop SCP trading, "which did nothing to stop the mismarking or the incurring of losses on the SCP portfolio."[90]

On March 30, the CIO reported a daily loss of $319 million, six times larger than any prior day's reported loss, but even this was understated due to mismarking.[91]

On April 6, 2012, the media reported that Iksil had, in the Plaintiff's words, "roiled the markets with positions so large it was distorting prices."[92] Dimon and Braunstein asked Drew for a "full diagnostic" of the SCP that day.[93] On April 10, 2012, the CIO reported an estimated daily loss of $6 million, but ninety minutes later, the figure had jumped to $400 million. That same day, the SCP internally reported that its year-to-date losses were $1.2 billion. At the end of that week, Dimon had an earnings call at which he characterized the media reports regarding the so-called London whale trades as a "tempest in a teapot."[94]

In the coming weeks, the Company "continued its positive spin on the CIO," even to regulators.[95] By May 4, the Company was reporting a loss of $1.6 billion to its OCC examiner-in-charge. On May 10, the Company filed its Form 10-Q

---

[90] Compl. ¶ 285.
[91] See id. ¶ 286.
[92] Id. ¶ 289.
[93] Id.
[94] Id. ¶ 293.
[95] See id. ¶ 296.

disclosing over $800 million in trading losses, with the potential for an additional billion dollars in losses, from a credit derivative position in the CIO. That same day, Dimon called the CIO loss, which he acknowledged to be approximately $2 billion with the potential for an increase by an additional $1 billion, "egregious."[96] He indicated that the SCP was "riskier, more volatile and less effective as an economic hedge than we thought."[97]

The consequences from this loss continued to mount and included a downgrading in the Company's short- and long-term debt by Fitch Ratings, decreasing stock prices, abandoning a share repurchase program initiated two months prior, and, eventually, the dismantling of the SCP. Ultimately, on October 15, 2012, the Company disclosed that the SCP losses had exceeded $6.25 billion. In a Form 10-Q filed November 8, 2012, the Company acknowledged deficiencies in the CIO's Value Control Group price verifications, among other things.[98]

On May 11, 2012, the same day that the Company internally reported a daily loss of $570 million for the SCP, the SEC, Federal Trade Commission, and Federal Reserve Bank of New York began investigations into the CIO's losses. The Department of Justice and FBI began criminal investigations on May 15, 2012.

---

[96] *Id.* ¶ 300.
[97] *Id.*
[98] *See id.* ¶ 313.

In January 2013, the Company entered into a consent order with the Board of Governors of the Federal Reserve and the Office of the Comptroller of the Currency (the "Consent Order"). The Consent Order stated that the OCC had identified "certain deficiencies, unsafe or unsound practices and violations of law or regulation."[99] On March 14, 2013, the Senate Report was published, with hearings beginning the next day. On September 18, 2013, the Company agreed to pay a total of $920 million in fines and penalties to the SEC and to UK regulators and was required to admit wrongdoing in connection with the SEC settlement.[100] On October 17, 2013, the Company entered into a settlement with the Commodity Futures Trading Commission, in which the Company neither admits nor denies liability, but agreed to pay $100 million to the CFTC and undertake certain remedial measures.

"To date, the SCP book has lost more than three times the revenues it produced in its first five years combined."[101]

G. *The Federal Derivative Action*

In 2012, a consolidated derivative action was commenced before Judge George B. Daniels of the United States District Court for the Southern District of

---

[99] *Id.* ¶ 323.
[100] *See id.* ¶ 328.
[101] *Id.* ¶ 314.

New York, which was captioned as *In re JPMorgan Chase & Co. Derivative Litigation*.[102] In *In re JPMorgan*, as characterized by the Defendants,

> [The] [p]laintiff alleged that "CIO has actually been operating as a high-risk proprietary trading desk since at least 2006 when it started trading in synthetic credit derivatives." By 2011, plaintiff contended, "CIO had become massively risky and out of control . . . and the fault lay squarely with JPMorgan's Board." Plaintiff asserted that JPMorgan's directors (i) "approv[ed] and/or condon[ed] the CIO's change in purpose from Company-wide risk mitigation to a highly risky proprietary trading desk," (ii) "chose not to implement new risk management efforts related to these new risks," (iii) "fail[ed] to respond to numerous obvious indications that the SCP was becoming drastically riskier," and (iv) "approv[ed] materially false and misleading statements and/or omissions that failed to informed shareholders" of the supposed change in CIO's purpose.[103]

In other words, the same allegations at issue here.

The court granted a motion to dismiss for failure to comply with Federal Rule 23.1, which is "either identical to or consistent with"[104] Chancery Court Rule 23.1, for failure to allege demand futility.[105] A motion for reconsideration was denied, which denial is under consideration on appeal.

---

[102] The Defendants note that Judge Daniels presides (or presided) over three other shareholder actions arising out of the CIO's 2012 losses: a federal securities law action, an ERISA action, and another derivative action in which the plaintiff made demand, which was refused. The ERISA action was dismissed for failure to state a claim and the wrongful refusal derivative action was dismissed for failure to adequately plead wrongful refusal. *See* Opening Br. in Supp. of Mot. to Dismiss the Verified Derivative Compl. for Failure to Adequately Allege Demand Futility at 10 n.4.

[103] *Id.* at 10–11 (internal citations to the complaint in that case omitted) (alterations in original).

[104] *Levner v. Saud*, 903 F. Supp. 452, 456 n.4 (S.D.N.Y. 1994) (citing *Allison v. Gen. Motors Corp.*, 604 F. Supp. 1106, 1116 (D. Del. 1985)).

[105] *In re JPMorgan Chase & Co. Derivative Litig.*, 2014 WL 1297824 (S.D.N.Y. Mar. 31, 2014).

*H. The New York State Court Actions*

Also in 2012, a consolidated derivative action was commenced before Justice Jeffrey K. Oing of the New York Supreme Court, Commercial Division, captioned as *Wandel v. Dimon*. In that case, as characterized by the Defendants,

> [P]laintiffs argued that CIO's 2012 losses were "the direct consequence of Defendants' failures to properly implement appropriate internal controls, oversight and risk management." According to the complaint, the Board "ignored numerous . . . red flags," including letters from a shareholder advocacy group, "warnings from regulators" and "risk level breaches." Plaintiffs further alleged that defendants "systematically concealed" from JPMorgan's shareholders and regulators the transformation of CIO from an office charged with "reduc[ing] risk for the Firm, into a poorly supervised proprietary trading operation."[106]

Again, the same allegations raised here.

On January 15, 2014, Justice Oing dismissed *Wandel*, without prejudice to the plaintiff *to make demand on the Board and proceed with a wrongful refusal case* should the Board reject that demand.[107] He held that the plaintiffs' allegations did not raise a reasonable doubt as to director independence based on their compensation, and that the plaintiff failed to adequately allege that the directors were not disinterested because of a substantial likelihood of personal liability on the claims asserted. He concluded,

---

[106] Opening Br. in Supp. of Mot. to Dismiss the Verified Derivative Compl. for Failure to Adequately Allege Demand Futility at 12 (internal citations to the complaint in that matter omitted) (second alteration in original).
[107] *Wandel v. Dimon*, Index No. 651830/12 (N.Y. Sup. Ct. Feb. 3, 2014) (Dkt. No. 79) (Aff. of Christopher M. Viapiano Ex. A).

31

I don't find that there is a reasonable belief for me to arrive at the conclusion that . . . the majority of the board members here were disinterested [sic] and could not exercise their independent business judgment decision with respect to a demand, such that the demand would be rendered futile.[108]

*Wandel v. Dimon* and *In re JPMorgan Chase & Co. Derivative Litigation,* together, are referred to as the "New York Actions."[109]

*I. The Board Review Committee*

The Defendants also note that, in response to stockholder demand letters asking the Board to investigate CIO losses and commence litigation against those responsible, the Board created a "Review Committee" of three outside directors.[110] The Review Committee retained counsel and conducted an eight-month review, culminating in a report which "concluded that the Board and the Risk Policy Committee discharged their duties with respect to the oversight of the Firm and the CIO,"[111] but recommended that certain "practices and policies . . . could be enhanced to strengthen the Firm's overall risk management function and the oversight of that function."[112] The Complaint alleges that the Review Committee members were not independent and that its report is "self-serving and obfuscate[s]

---

[108] *Id.* at 57:8–13.

[109] The Defendants also note that, in another case, *Siegel v. Bell,* Index No. 652151/12, the New York Supreme Court held that demand on JPMorgan's Board was not futile in connection with allegations related to the CIO's losses in 2012. Because that case preceded *Wandel,* the Defendants note that I need not consider the preclusive effect of *Siegel.* *See* Opening Br. in Supp. of Mot. to Dismiss the Verified Derivative Compl. for Failure to Adequately Allege Demand Futility at 15 n.9.

[110] *See* Aff. of Christopher M. Viapiano ¶¶ 4–5.

[111] *Id.* Ex. E at 2.

[112] *Id.*

the sequence of events, [permitting] the Defendants to refuse to hold any high-level person accountable for any event that led up to the CIO losses."[113]

## II. STANDARD OF REVIEW

Where board action is challenged derivatively, Rule 23.1 requires plaintiffs to plead with particularity facts that raise a reasonable doubt that the directors are disinterested and independent or that the challenged transaction was otherwise the product of a valid exercise of business judgment.[114] Where board inaction is challenged, as in the case of a claim relating to the board's oversight of the company, a plaintiff must plead with particularity facts that raise a reasonable doubt that, as of the time its complaint is filed, the board could have exercised independent and disinterested business judgment in responding to a demand.[115]

The Defendants assert the preclusive effect of prior decisions of New York courts. Under New York law, "[t]he doctrine of collateral estoppel precludes a party from relitigating an issue which has been previously decided against him in a proceeding in which he had a fair opportunity to fully litigate the point."[116] *Res judicata* operates so that, "as to the parties in a litigation and those in privity with them, a judgment on the merits by a court of competent jurisdiction is conclusive

---

[113] Compl. ¶ 330. The Company also formed a Management Task Force to investigate. It produced a 132-page report, which was reviewed and overseen by the Review Committee. The Plaintiff alleges that the Task Force's report is also flawed. *See id.*

[114] *Brehm v. Eisner*, 746 A.2d 244, 253 (Del. 2000).

[115] *Rales v. Blasband*, 634 A.2d 927, 934 (Del. 1993).

[116] *Kaufman v. Eli Lilly & Co.*, 482 N.E.2d 63, 67 (N.Y. 1985) (internal quotation marks omitted).

of the issues of fact and questions of law necessarily decided therein in any subsequent action."[117]

## III. ANALYSIS

The Defendants move to dismiss on two separate grounds—first, that collateral estoppel or *res judicata* preclude the Plaintiff from litigating demand futility yet again, and second, even if collateral estoppel or *res judicata* do not apply, that the Plaintiff has not satisfied its burden to show demand is excused as futile.

Before turning to these arguments on the Motion to Dismiss, I think it is worthwhile to consider briefly the context of the derivative action here. The Plaintiff is alleging a breach of the duty of loyalty by a failure to act in good faith on the part of the Defendants for "knowingly and/or recklessly fail[ing] to ensure that the risk management and procedures designed and implemented for the Company were consistent with the Company's corporate strategy and risk profile [and] by failing to ensure that JPMorgan properly identified and managed known risks in its lines of business."[118] The Defendants "acted disloyally to JPMorgan,

---

[117] *Gramatan Home Investors Corp. v. Lopez*, 386 N.E.2d 1328, 1331 (N.Y. 1979). As noted below, there is no difference between New York law and federal law as it relates to collateral estoppel and *res judicata.*
[118] Compl. ¶ 374.

34

thereby, violating and breaching their fiduciary duties of oversight, good faith, honesty, and loyalty."[119]

The allegations here involve, primarily, a failure to adequately assess business risk at JPMorgan. The Complaint's primary allegation is that the directors, through the Audit Committee and otherwise, were well aware that the operation of the CIO in the years before 2012 involved substantially increasing risk, revenue, and profit, and that the directors failed to act, apparently willing to accept the increased risk and enjoy the increased profit, a policy that proved spectacularly ill-conceived. It is not entirely clear under what circumstances a stockholder derivative plaintiff can prevail against the directors on a theory of oversight liability for failure to monitor *business risk* under Delaware law; the Plaintiff cites no examples where such an action has successfully been maintained. Business risk is the very stuff of which corporate decisions are constituted. Where, as here, the allegations are that the level of risk being undertaken by management was reported to the board, and the board acted (or failed to act) in a way that, in hindsight, proved costly to the corporation, and which the derivative plaintiff, with the benefit of that hindsight, brands wrongful, it is difficult to see how successful maintenance of that derivative action can be consistent with this jurisdiction's

---

[119] *Id.* ¶ 375. I note that these four "duties" in fact implicate the duty of loyalty.

model of corporate governance, short of circumstances that would support a waste claim.[120]

Assuming failure to oversee business risk can support a *Caremark*-style action, to state a claim in light of the exculpatory provision enjoyed by the directors here, a stockholder derivative plaintiff would have to plead with particularity that "the board *consciously* failed to implement any sort of risk monitoring system or, having implemented such a system, *consciously* disregarded red flags signaling that the company's employees were taking facially improper, and not just ex-post ill-advised or even bone-headed, business risks."[121]

With this context of the underlying cause of action in mind, I turn to the Defendants' arguments in favor of their Motion to Dismiss. I am cognizant that I must "address exclusively" the issue-preclusion portion of the Motion to Dismiss;[122] only if the Plaintiff survives the Defendants' assertion of collateral estoppel may I turn to the issue of demand futility, to which the analysis above might prove pertinent.

---

[120] The reader is referred to the cogent discussion of this issue by then-Chancellor Chandler in *In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106 (Del. Ch. 2009).
[121] *In re Goldman Sachs Grp., Inc. S'holder Litig.*, 2011 WL 4826104, at *22 n.217 (Del. Ch. Oct. 12, 2011).
[122] *Pyott v. Louisiana Mun. Police Employees' Retirement System*, 74 A.3d 612, 616 (Del. 2013).

## A. Issue Preclusion under New York Law

The Defendants here argue that the Plaintiff may not relitigate the issue of demand futility previously decided by the New York courts because of the applicability of collateral estoppel and *res judicata*.

Collateral estoppel applies to prohibit relitigation of factual issues previously adjudicated; *res judicata* bars entirely a suit that is based on the same cause of action between the same parties as an action previously decided on the merits.[123] In this case and at this stage in the litigation, the effect is essentially the same—if collateral estoppel applies to bar re-litigation of the issue of demand futility, this action cannot go forward because the Plaintiff will have failed to satisfy the requirements of Rule 23.1, and therefore lack standing to proceed.[124] Because I find collateral estoppel applicable here, I need not consider *res judicata* further.

Judgments by other courts, both state and federal, must be given the same force and effect in this Court as they would be given in the "rendering court."[125] Even in the derivative context, which invokes the internal affairs doctrine, "[o]nce

---

[123] *See, e.g., M.G. Bancorporation, Inc. v. Le Beau*, 737 A.2d 513 (Del. 1999).

[124] The Defendants' arguments focus primarily on collateral estoppel. *See* Opening Br. in Supp. of Mot. to Dismiss the Verified Derivative Compl. for Failure to Adequately Allege Demand Futility at 25 n.13.

[125] *See* U.S. Const., Art. IV, § 1 ("Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State."); 28 U.S.C. § 1738 ("The records and judicial proceedings of any court of any [] State . . . shall have the same full faith and credit in every court within the United States"); *Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 507–08, (finding that state courts are required to give federal judgments the same effect as they would be given by the preclusion rules of the state in which the federal court is located); *see also Pyott*, 74 A.3d at 615–16.

a court of competent jurisdiction has issued a final judgment, [] a successive case is governed by the principles of collateral estoppel, under the full faith and credit doctrine, and not by demand futility law, under the internal affairs doctrine."[126] A motion to dismiss based on collateral estoppel is premised upon "federalism, comity, and finality."[127] That is, "the undisputed interest that Delaware has in governing the internal affairs of its corporations must yield to the stronger national interests that all state and federal courts have in respecting each other's judgments."[128]

Here, in light of the previously decided New York Actions, I must apply New York law in considering the elements of collateral estoppel.[129] Under New York law, two requirements must be met before collateral estoppel will bar a party from relitigating an issue decided against it or a party with which it is in privity:

> First, the party seeking the benefit of collateral estoppel must prove that the identical issue was necessarily decided in the prior action and is decisive in the present action. Second, the party to be precluded from relitigating an issue must have had a full and fair opportunity to contest the prior determination.[130]

---

[126] *Pyott*, 74 A.3d at 616.
[127] *Id.*
[128] *Id.*
[129] New York recognizes that its law of collateral estoppel has "no discernible difference" from federal law. *Carroll v. McKinnell*, 2008 WL 731834, at *2. The Plaintiff has not raised any difference. Accordingly, I will consider New York state law in connection with deciding whether the New York Actions, which include both state and federal decisions, are preclusive.
[130] *D'Arata v. New York Cent. Mut. Fire Ins. Co.*, 564 N.E.2d 634, 636 (1990)

As to the question of privity, under New York law, "[i]t is well-settled that collateral estoppel may be applied in the shareholder derivative context."[131] This principle recognizes that "shareholder plaintiffs are treated like equal and effectively interchangeable members of a class action because their claims belong to and are brought on behalf of the corporation" and that, accordingly, "a judgment rendered in such an action brought on behalf of the corporation by one shareholder will generally be effective to preclude other actions predicated on the same wrong brought by other shareholders."[132] The Plaintiff does not point to any New York law to the contrary.[133]

The next inquiry, then, is whether the party seeking operation of collateral estoppel has carried the initial burden to demonstrate that the "same issue was necessarily decided in a prior action," at which point, "the burden then shifts to the party opposing the application of collateral estoppel to demonstrate the absence of

---

[131] *Carroll ex rel Pfizer, Inc. v. McKinnell*, 2008 WL 731834, at *2 (N.Y. Sup. Ct. Mar. 17, 2008).

[132] *Levin ex rel. Tyco Int'l Ltd. v. Kozlowski*, 2006 WL 3317048, at *10 (N.Y. Sup. Ct. Nov. 14, 2006) (quoting *Parkoff v. General Tel. & Elecs. Corp.*, 53 N.Y.2d 412, 420 (1981)), *aff'd sub nom. Levin v. Kozlowski*, 45 A.D.3d 387, 846 N.Y.S.2d 37 (2007).

[133] The Plaintiff cites *In re FirstEnergy S'holder Deriv. Litig.*, 320 F. Supp. 2d 621, 626 (N.D. Ohio 2004) for the proposition that "one shareholder's concession on board's independence does not preclude others from exercising their rights to assert demand futility." *See* Pl.'s Br. in Opp'n to Defs.' Mot. to Dismiss the Verified Derivative Compl. for Failure to Adequately Allege Demand Futility at 33 n.13. That holding is inapposite here. A wrongful refusal case, in which a plaintiff would have conceded board independence *ex ante*, is not the same as a demand futility case contesting that precise issue. Thus, *FirstEnergy* turns on lack of identity of the issue decided, not, in my view, lack of privity.

a full and fair opportunity to litigate the issue."[134] The Plaintiff has not argued an absence of an opportunity to fully and fairly litigate this issue;[135] accordingly, the sole question as to the applicability of collateral estoppel is whether the Defendants have shown the "identical issue was necessarily decided" in the New York Actions.

## B. *Identity of the Issues*

Correct resolution of the question set forth above necessarily requires a proper formulation of the issue under consideration. Here, that issue involves whether demand should be excused under Rule 23.1; specifically, whether a majority of the Company's directors face a substantial likelihood of personal liability for failure to oversee risk undertaken by the CIO.[136] That was the precise

---

[134] *Carroll*, 2008 WL 731834, at *7; *D'Arata*, 564 N.E.2d at 636 ("The burden is on the party attempting to defeat the application of collateral estoppel to establish the absence of a full and fair opportunity to litigate.").

[135] Similarly, the Plaintiff has not argued that the New York plaintiffs were "inadequate representatives" of the class. *See Pyott v. Louisiana Mun. Police Employees' Retirement System*, 74 A.3d 612, 618 (Del. 2013) (rejecting a presumption of inadequate representation for "fast filers").

[136] The Complaint also alleged, generally, that the Director Defendants "are conflicted by [] substantial benefits" related to their service as directors—*i.e.*, "substantial salaries, stock awards and other benefits." Compl. ¶ 367. *See also id.* ¶¶ 368–71. This precise issue was considered— and rejected—by the courts in the New York Actions. *See, e.g.*, Aff. of Christopher M. Viapiano Ex. B ¶ 372 (asserting, in *In re JPMorgan Chase & Co.*, an inability to exercise independent judgment in the face of director compensation); *In re JPMorgan Chase & Co. Derivative Litig.*, 2014 WL 1297824 at *7 (S.D.N.Y. Mar. 31, 2014) (finding a failure to plead with particularity the materiality of the compensation or personal relationships alleged). *See also* Aff. of Christopher M. Viapiano Ex. C ¶¶ 356–64 (asserting, in *Wandel*, disabling financial conflicts); *id.* Ex. A at 56:7–11 (rejecting director compensation as a basis for a lack of independence). In any event, this argument was not raised in the briefing on the Motion to Dismiss, and, therefore, has been waived.

question presented by the plaintiffs (and answered by the courts in the negative) in the New York Actions. The Plaintiff here does not contend otherwise, but points out that issue preclusion obtains only to identical issues decided in the context of the same "controlling facts."[137] They argue strenuously that the controlling facts in the prior actions—unsupported as they were by the supplemental information the Plaintiff here garnered via § 220—were substantially different from controlling facts that I must apply in this matter.

The Plaintiff asserts that its allegations are "materially different" from those in the New York Actions[138] under the rationale in *Brautigam v. Blankfein*[139] and *Asbestos Workers Philadelphia Pension Fund v. Bell*.[140] In *Brautigam*, the court noted that collateral estoppel will only apply in "situations where the matter raised in the second suit is identical in all respects with that decided in the first proceeding *and where the controlling facts and applicable legal standards remain unchanged*."[141] In *Bell*, the court found collateral estoppel inapplicable "because, although similar, *the facts at issue* here are not identical to *the factual allegations in the prior [actions]* arising out of [residential mortgage-backed securities]."[142]

---

[137] *See Brautigam v. Blankfein*, 8 F. Supp. 3d 395, 401 (S.D.N.Y. 2014), *aff'd sub nom. Brautigam v. Dahlback*, 598 F. App'x 53 (2d Cir. 2015).
[138] Pl.'s Br. in Opp'n to Defs.' Mot. to Dismiss the Verified Derivative Compl. for Failure to Adequately Allege Demand Futility at 26.
[139] 8 F. Supp. 3d 395.
[140] 2014 WL 1272280 (N.Y. Sup. Ct. Mar. 28, 2014).
[141] *Brautigam*, 8 F. Supp. 3d at 401 (emphasis added).
[142] *Bell*, 2014 WL 1272280, at *2.

The Defendants contend, and I agree, that these cases turn on the fact that the there-instant and -prior actions relied on materially different conduct allegedly giving rise to liability. Therefore, the issues presented were not identical, and accordingly, not subject to issue preclusion.[143] *Brautigam* involved a claim of breach of fiduciary duty in connection with selling collateralized debt obligations at artificially high prices; the prior action involved different collateralized debt obligations and, thus, different conduct and controlling facts. Similarly, in *Bell*, the plaintiff alleged a type of misconduct that had not been alleged in prior actions.[144] Here, by contrast, the *underlying* conduct that gives rise to the Plaintiff's claims is the same at issue in the New York Actions.

The Plaintiff alleges that the facts underlying the issue presented in this and the previous cases are more developed here, and are pleaded more compellingly, and thus, that the controlling facts here are not identical to those in the New York Actions. But that misapprehends the standard. It cannot be the case that the "controlling facts," which must remain "unchanged" for purposes of collateral

---

[143] Reply Br. in Supp. of Mot. to Dismiss the Verified Derivative Compl. for Failure to Adequately Allege Demand Futility at 13.

[144] *Bell*, 2014 WL 1272280, at *2 ("However, the JP Morgan defendants acknowledge in their brief that Plaintiff here is asserting 'slightly differing factual allegations from the earlier dismissed complaints.' In [one prior action] the shareholders challenged the Board's actions with regard to [residential mortgage-backed securities], but made no factual allegations that the Board granted unfettered authority to the A & LS Committee. Meanwhile, [a second prior action] dealt purely with the issue of mortgage foreclosure robo-signing, which is not at issue here. The factual allegations are not identical to the prior shareholder derivative actions and thus, collateral estoppel is inapplicable to bar this action.").

estoppel,[145] are simply those facts presented in the *complaint*. If that were the case, collateral estoppel would never apply and the plaintiff could litigate serially by endlessly alleging more factual support for the proposition he chooses to advance—this is clearly contrary to the efficiency and fairness principles underlying collateral estoppel.[146] The "controlling facts" that must be identical are those that actually obtain to the issue, only a subset of which will typically be pled: it is the Plaintiff's burden to plead sufficient of the material facts to survive a motion to dismiss.[147] That is to say, the underlying conduct is what is at issue, not whether the Complaint raises additional facts, or a more compelling characterization of those facts, regarding the same conduct previously at issue.[148]

Those in privity with the Plaintiff here alleged (insufficiently) that the Board was

---

[145] *See Brautigam*, 8 F. Supp. 3d at 401.

[146] *See, e.g., Kaufman v. Eli Lilly & Co.*, 65 N.Y.2d 449, 455, 482 N.E.2d 63, 67 (1985) ("[Collateral estoppel] is a doctrine intended to reduce litigation and conserve the resources of the court and litigants and it is based upon the general notion that it is not fair to permit a party to relitigate an issue that has already been decided against it.").

[147] The utility of such a rule is obvious in the case of a single plaintiff trying to relitigate the same issue via pleading additional facts. A specter of unfairness appears, however, in the derivative context, where a derivative plaintiff with a viable claim may be estopped from proceeding based on the inadequate efforts of a fellow stockholder in privity, a feckless fast filer. Addressing this unfairness, I believe, does not require evisceration of the rules of issue preclusion; the feckless fast filer problem may be addressed by a showing that the first filer was an inadequate corporate representative. *See Pyott v. Louisiana Mun. Police Employees' Ret. Sys.*, 74 A.3d 612, 618 (Del. 2013). As pointed out above, the Plaintiff here has not alleged that the New York plaintiffs inadequately represented the corporation. *Pyott* makes clear that a presumption of inadequacy does not arise upon a showing that the prior plaintiff failed to use a section 220 request to develop its case; how a demonstration of inadequacy may be made in the Rule 23.1 context, and the complex issues of comity, efficiency and fairness which would arise therewith, must be addressed through litigation where the issue is fairly presented.

[148] A dismissal with prejudice cannot be avoided through repleading the precise cause of action, with more facts alleged—that would obliterate the distinction between dismissal with, and without, prejudice.

unable to act due to a substantial likelihood of liability, thus excusing demand. Their actions were dismissed for failure to comply with Rule 23.1[149] and the Plaintiff here is collaterally stopped from re-litigating that identical issue.

### 1. Additional Factual Allegations

Even if the Plaintiff were correct that by asserting more facts, it gets another whack at the piñata, the facts they allege are merely cumulative to the factual situations alleged in the prior actions. They may present a case that an awareness of risk in the CIO, on the part of the directors, existed earlier than the facts alleged in the prior actions had disclosed, but the fundamental allegations remain the same. For completeness' sake, I briefly address those allegations below.

---

[149] *In re JPMorgan Chase & Co. Derivative Litig.*, 2014 WL 1297824 (S.D.N.Y. Mar. 31, 2014), was dismissed with prejudice. *Wandel v. Dimon*, Index No. 615830/2012, was dismissed "without prejudice for the Plaintiff to replead, if they are so advised, with respect to making a demand subsequent to this day." Aff. of Christopher M. Viapiano Ex. A at 58:17–19. Of course, though the dismissal was without prejudice to replead upon making demand, the Plaintiff, either here or in that case, would not be able to replead the *demand futility* issue. For purposes of the applicability of collateral estoppel, as distinguished from *res judicata*, a dismissal with prejudice is not required to bar relitigation of facts previously adjudicated; *res judicata*, however, would entirely bar a case that was previously decided on the merits. *Compare D'Arata v. New York Cent. Mut. Fire Ins. Co.*, 564 N.E.2d 634, 636 (N.Y. 1990) ("As this doctrine has evolved, only two requirements must be satisfied. First, the party seeking the benefit of collateral estoppel must prove that the identical issue was necessarily decided in the prior action and is decisive in the present action. Second, the party to be precluded from relitigating an issue must have had a full and fair opportunity to contest the prior determination." (citation omitted)), *with In re Hunter*, 827 N.E.2d 269, 274 (N.Y. 2005) ("Under the doctrine of *res judicata*, a party may not litigate a claim where a judgment on the merits exists from a prior action between the same parties involving the same subject matter." (emphasis added)) *and Landau v. LaRossa, Mitchell & Ross*, 892 N.E.2d 380, 383 (N.Y. 2008) ("[A] dismissal 'without prejudice' lacks a necessary element of res judicata—by its terms such a judgment is not a final determination on the merits.").

44

The Plaintiff contends that the additional document production allowed it to plead that "various Defendants were on notice, well earlier than the New York Actions pleaded, of specific information at specific times, and, in the face of this specific information, they deliberately failed to act to establish necessary internal controls."[150] Specifically, the Plaintiff argues that its Complaint is different from the prior complaints in alleging: (1) "that by March 17, 2009 [the date of an Audit Committee meeting in which the March 2009 Audit Presentation was made[151]], the Audit Committee knew and reported to the Board that 'the CIO's purportedly conservative mission statement and risk-averse trading profile had become inconsistent with the increased complexity of the growing portfolio;'"[152] (2) that, via the March 2009 Audit Presentation, the "Defendants became aware that the CIO had deployed the [I]nvestment [B]ank's trading platform 'to handle complex derivative trades to address the fact that its prior infrastructure could not handle the new activities the CIO was engaging in;'"[153] (3) that "no later than July 20, 2010, the Audit Committee knew that, for the three years prior, the CIO's business platform ha[d] significantly shifted, increasing both 'in size, complexity and range of product investments' and 'the demands on risk management, controls,

---

[150] Pl.'s Br. in Opp'n to Defs.' Mot. to Dismiss the Verified Derivative Compl. for Failure to Adequately Allege Demand Futility at 27.

[151] *See* Compl. ¶ 165.

[152] Pl.'s Br. in Opp'n to Defs.' Mot. to Dismiss the Verified Derivative Compl. for Failure to Adequately Allege Demand Futility at 27–28 (quoting Compl. ¶ 162).

[153] *Id.* at 28 (quoting Compl. ¶ 169.

45

technology and infrastructure;'"[154] and (4) a number of negative inferences arising from the lack of documents produced in response to the Plaintiff's § 220 Demand between 2009 and 2012.[155]

The Complaint, robust though it may have been in its use of documents obtained from the § 220 Demand, pleads the identical issue that was presented to the courts in the New York Actions. That the alleged "red flags" pled in the New York Actions did not date back to 2009 does not mean that the inclusion of those facts in the Complaint renders the issue non-identical compared with the same issue in the New York Actions. These facts were part of the universe of facts informing the very conduct at issue in the New York Actions, and are merely cumulative of those pled in New York. I find the decisions in those cases preclude relitigation of the issue of whether demand is excused.

Additionally, the Plaintiff argues, "[U]nlike the New York Actions, the Complaint alleges a substantial change in the very nature of the CIO and not merely an additional increase in risk."[156] This "substantial change" was "distinctly exemplified in the CIO's integration" of the PPB technology from the Investment Bank.[157] The change in the nature of the CIO, the Plaintiff alleges, bears on both

---

[154] *Id.* at 28–29 (quoting Compl. ¶182)
[155] *See id.* at 29–33.
[156] Pl.'s Br. in Opp'n to Defs.' Mot. to Dismiss the Verified Derivative Compl. for Failure to Adequately Allege Demand Futility at 24.
[157] *Id.* at 24.

liability and demand futility and because it was not raised in the New York Actions, those cannot operate through collateral estoppel or res judicata to this Complaint.[158] The Plaintiff, however, is simply mistaken in the assertion that a change in the "nature" of the CIO was omitted from the allegations in the New York Actions. In *In re JPMorgan*, the plaintiffs alleged that the "CIO had been *converted* into a proprietary trading desk that sought risky, short-term profits."[159] In *Wandel*, the plaintiff asserted that Dimon, Drew, "and other JPMorgan senior executives[] *aggressively transformed* the CIO into a high-risk, proprietary trading desk."[160] Thus, the accusation of a "change in the very nature of the CIO" was before the New York courts deciding demand futility.

## 2. Effect of Agency Decisions

At Oral Argument, for the first time, the Plaintiff raised an argument that collateral estoppel should not apply because its Complaint was filed after five agency decisions adverse to the Company had been made. One, by the SEC, required the Company to admit fault. While the agency decisions were presented, at least partially, as background facts in the Plaintiff's briefing, the briefing did not contend that these agency decisions separated the issue before me from those decided in the New York Actions, precluding collateral estoppel, and the

---

[158] *Id.* at 24–25.
[159] Aff. of Christopher Viapiano Ex. B (the complaint there) ¶ 71 (emphasis added).
[160] *Id.* Ex. C (the complaint there) ¶ 84 (emphasis added).

47

Defendants had no meaningful opportunity to respond to such an argument.[161] Accordingly, I find that any such argument was waived.[162]

### C. Collateral Estoppel Bars Relitigation of the Issue of Demand Futility

Because I find that the Defendants have shown that the identical issue—whether demand should be excused because a majority of JPMorgan's directors face a substantial likelihood of personal liability based on a failure to monitor the controls and risk of CIO's operation —was decided in the New York Actions, and the Plaintiff has not demonstrated that its allegations involve different issues, and because the Plaintiff has not alleged that the plaintiffs in New York lacked a full and fair opportunity to litigate in the prior actions, I find that collateral estoppel applies and the issue of demand futility cannot be relitigated.

In light of that finding, I need not—and, indeed, should not—reach the merits of the demand futility argument.

### IV. CONCLUSION

For the foregoing reasons, I grant the Defendants' Motion. An appropriate order accompanies this Memorandum Opinion.

---

[161] *See also* Oral Arg. Tr. at 48:13–50:5.
[162] *Emerald Partners v. Berlin*, No. CIV.A. 9700, 2003 WL 21003437, at *43 (Del. Ch. Apr. 28, 2003) ("It is settled Delaware law that a party waives an argument by not including it in its brief."), *aff'd*, 840 A.2d 641 (Del. 2003).

48

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

ASBESTOS WORKERS LOCAL 42 )
PENSION FUND, derivatively on behalf )
of Nominal Defendant JPMORGAN )
CHASE & CO., a Delaware corporation, )
    )
    Plaintiff, )
    )
v. ) C.A. No. 9772-VCG
    )
LINDA B. BAMMANN, JAMES A. )
BELL, CRANDALL C. BOWLES, )
STEPHEN B. BURKE, DAVID M. )
COTE, JAMES S. CROWN, JAMIE )
DIMON, TIMOTHY P. FLYNN, )
ELLEN V. FUTTER, LABAN P. )
JACKSON, MICHAEL A. NEAL, )
DAVID C. NOVAK, LEE R. )
RAYMOND, WILLIAM WELDON, )
DOUGLAS L. BRAUNSTEIN, )
MICHAEL CAVANAGH, INA DREW, )
IRVIN GOLDMAN, JOHN HOGAN, )
PETER WEILAND, JOHN WILMOT, )
AND BARRY ZUBROW, )
    )
    Defendants, )
    )
    and )
    )
JPMORGAN CHASE & CO., )
    )
    Nominal Defendant. )

## **ORDER**

AND NOW, this 22nd day of May, 2015,

The Court having considered the Defendants' Motion to Dismiss the Verified Derivative Complaint for Failure to Plead Demand Futility (the "Motion"), and for the reasons set forth in the Memorandum Opinion dated May 22, 2015, IT IS HEREBY ORDERED that the Defendants' Motion is GRANTED.

SO ORDERED:

/s/ Sam Glasscock III

Vice Chancellor